IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 23-10013-WGY |
| | ) | |
| KELCHI COLLINS UMEH, | ) | |
| a/k/a "Bishop," a/k/a "Jacob Emmanuel," | ) | |
| a/k/a "James Emmanuel," a/k/a "Kelvin | ) | |
| Thomas," a/k/a "Paul Douglas," a/k/a | ) | |
| "Brian Morgan," a/k/a "John Isiah," | ) | |
| | ) | |
| Defendant | ) | |

## **GOVERNMENT'S SENTENCING MEMORANDUM**

Beginning no later than June 2018 and continuing through at least April 2020, defendant Kelechi Collins Umeh participated in a scheme to steal more than $1 million from romance and advance fee scam victims.  With co-conspirator Mike Amiegbe, Umeh opened at least 17 bank accounts using fake passports in the names of five aliases to which victims sent more than $1.3 million in funds.  Once victim funds were received, Umeh or Amiegbe (or a third co-conspirator, Kofi Osei) quickly withdrew them.  The victims, who were often elderly, were deprived of thousands of dollars, and in some instances, their life savings.  For his conduct, Umeh should be sentenced to 57 months' imprisonment, 24 months of supervised release, restitution of $878,652.29 (of which $609,237.82 is joint and several with co-conspirator Amiegbe[1]), and forfeiture as laid out in the government's forfeiture motion (Dkt. 34).

---

[1] *See* Amended Judgment, *United States v. Amiegbe*, No. 21-cr-10339-IT (D. Mass. Aug. 31, 2023) at 8.

1

**Offense Conduct**

Umeh, Amiegbe, and their co-conspirators operated what is known as "romance" and "advance fee" scams. A romance scam is a type of fraud in which conspirators create fictitious profiles on online dating or social websites. Conspirators then use these online dating profiles to capitalize on their victims' desire to find companions, gain their trust, and, once that trust is gained, direct victims to transfer money under false pretenses. An advance fee scam is a type of fraud in which a victim believes they are providing money up front in order to obtain a greater amount of money or a service at a later date—which date never comes.

Umeh's role in the scheme was to open bank accounts using fake identification documents to receive victim funds, quickly withdraw funds after victims deposited money into those accounts, and transfer the money to co-conspirators. Between at least June 2018 through at least April 2020, Umeh used at least five fake identities—"John Isiah," "Paul Douglas," "Kelvin Thomas," "Jacob Emmanuel," and "Brian Morgan"—to open or access 17 bank accounts at various local banks, including Bank of America, Citizens Bank, Santander Bank, and TD Bank. More than $1.3 million flowed through these accounts in less than two years.

Among the victims was a 70-year-old woman from San Antonio, Texas, who sent more than $720,000 to accounts Umeh and his co-conspirators controlled, including approximately $336,500 to accounts Umeh, Amiegbe, and a third co-conspirator, Kofi Osei, controlled. This victim sent the funds under the belief that they were for her online boyfriend, "Gibson Banks," who told her he was a member of the U.S. military stationed in Syria and who purportedly needed funds to retrieve a "consignment box" containing $24 million from Belgium and to secure "Banks's" release from a Syrian prison. Another victim was a cash advance company based in California that sent more than $78,000 to an account Umeh controlled. This victim sent the funds

under the belief that they were an advance payment on an expected wrongful termination settlement. In total, more than 30 victims transferred more than $1.3 million to bank accounts that Umeh and Amiegbe controlled.[2]

Separate from the romance and advance fee scams, more than $42,000 in fraudulent unemployment benefits from Massachusetts and Washington were deposited into bank accounts that Umeh and Amiegbe controlled.

**Guideline Calculation**

The parties and the Probation Office agree that Umeh's total offense level is 24. That calculation reflects a base offense level of 7 under Section 2B1.1(a)(1); an 14-level increase under Section 2B1.1(b)(1)(H) because the offense involved a loss of more than $550,000 but not more than $1.5 million; a 2-level increase under Section 2B1.1(b)(2)(A)(i) because the offense involved 10 or more victims; a 2-level increase under Section 2B1.1(b)(10)(B) because a substantial part of the scheme was committed from outside the United States; a 2-level increase under Section 2B1.1(b)(11)(A)(ii) because the offense involved the possession or use of an authentication feature; and a 3-level decrease pursuant to Section 3E1.1 for acceptance of responsibility. Umeh has a Criminal History Category of II, and thus the resulting Guidelines sentencing range is between 57 to 71 months.

---

[2] Some of these victims overlap with the more than 150 victims who sent more than $4.3 million to bank accounts co-conspirator Osei controlled. In determining the loss and restitution amounts, however, the government has not included losses attributable to accounts Osei and other co-conspirators controlled, because those losses were not necessarily foreseeable to Umeh. For the same reason, while more than $1.3 million flowed through the accounts that Umeh and Amiegbe controlled, the government is seeking restitution from Umeh for only $878,652.29, which is the amount attributable to Umeh.

**Sentencing Recommendation**

The government recommends a sentence of 57 months' imprisonment, 24 months of supervised release, $878,652.29 in restitution, and forfeiture.[3]

*1.  The Nature and Circumstances of the Offense*

Umeh's crime was serious and caused significant harm.  He and his co-conspirators capitalized on lonely, often elderly, individuals' desire to find companions, using promises of love to persuade victims to wire large sums of money into accounts that Umeh and his co-conspirators opened using counterfeit foreign passports.  Some of these victims lost hundreds of thousands of dollars.  While Umeh may not have wooed the victims, he surely understood that they were wiring large sums of money to accounts he opened *in the names of individuals who did not exist*.  Once victims wired money to these accounts, Umeh and Amiegbe stood ready to collect, withdrawing the funds within days of deposit.  This readiness to withdraw the money so promptly is an indication of the degree of coordination among the members of the conspiracy, which, as noted above, obtained more than $1.3 million from victims.  The losses the fraud caused in a relatively brief period, the number and identity of the victims, and the sophisticated manner in which it was carried out are measures of the seriousness of the offense and counsel in favor of a lengthy term of imprisonment.

*2.  The History and Characteristics of the Defendant*

According to the PSR, Umeh grew up in a strict but loving family.  While the PSR describes some culture shock in arriving in the United States, that is true of many immigrants, including

---

[3] Umeh suggests that he agreed to a restitution amount "radically above his actual gain." Dkt. 36 at 4.  But, under the Mandatory Victim Restitution Act, 18 U.S.C. § 3663a, the Court "shall order" restitution to victims for the property they lost or equal to the value of the property they lost.  How much of the victims' funds Umeh kept versus how much he passed on to his co-conspirators is irrelevant to the award of restitution.

those who arrive as minors, yet they do not resort to crime.  In addition to his brothers, Umeh appears to have a supportive fiancée and strong family structure with his children.  While at the time the PSR was prepared, Umeh had full physical custody of one of his children, it appears that the child's mother was attempting to regain custody, and in any event has been an active presence in the child's life.[4]  In sum, nothing in Umeh's background overcomes the other sentencing factors discussed herein that weigh so heavily toward a meaningful sentence of imprisonment.

In his sentencing memorandum, Umeh asserts that he "accepted an invitation" to participate in the scheme because he was "desperate for money so that he could give his father the burial honors he deserved."  Dkt. 36 at 1, 7.  However, the claim that he was "invited" to participate is inconsistent with statements Umeh made during a proffer session with the government.  There, he indicated that he affirmatively reached out to co-conspirators like Osei and Amiegbe to join the scheme, but that they would not include him at first because they did not trust him not to steal the money coming into the accounts, rather than taking his cut and passing the rest on to co-conspirators in Africa.  According to Umeh, Amiegbe eventually took a liking to him and brought him in.  Further, the evidence demonstrates Umeh began participating in the scheme well before his father's death in 2019.  Indeed, Umeh opened a bank account in the "John Isiah" alias at Citizens Bank in June 2018, *see* PSR ¶ 13, and exchanged messages via WhatsApp with co-conspirator Osei about alias bank accounts and addresses associated with those accounts by at least February 2018.

---

[4] While Umeh indicated he has concerns about the child's mother resuming custody, including because she may have been an accessory to a murder, it is notable that, in May 2022, Umeh went to trial for just that, PSR ¶ 81, albeit the jury did not find him guilty beyond a reasonable doubt.

Umeh also claims that he voluntarily withdrew from the scheme before his arrest, but again, the evidence belies this claim. Umeh continued participating in the scheme through at least January 2020, when he opened bank accounts under the "Jacob Emmanuel" alias at three different banks, *see* PSR ¶ 19, which accounts were active through May 2020 (and Umeh was captured on bank surveillance accessing accounts through late April 2020). *See, e.g.*, Dkt. 2-1, Complaint Affidavit (July 22, 2022) ¶¶ 17-35. WhatsApp messages between Umeh and Osei further suggest that Umeh continued participating in the scheme throughout 2020. Specifically, on November 23, 2020, Umeh sent Osei a message with an email address that he also provided to Bank of America when opening an account in the name of "Jacob Emmanuel." Within minutes, Umeh and Osei also messaged about an "aza"—Nigerian slang for a bank account—and an alias named "Joel Bitton." Shortly thereafter, in February 2021, Osei was arrested. In March 2021, Amiegbe and several other co-conspirators were arrested. Thus, while Umeh may have ceased participating in the scheme before his arrest in July 2022, it may have been less a "voluntary" withdrawal and more a result of the arrest of his co-conspirators.

3. *The Need for the Sentence Imposed To Promote Respect for the Law and to Provide Just Punishment for the Offense.*

Here, Umeh's motive was purely personal gain. He understood that his gain in this scheme represented another's loss. Contrary to his claim, he did not act out of coercion, duress, or desperation. His participation was not the result of a momentary lapse in judgment or weakness of will. Rather, he demonstrated a prolonged willingness to engage in an exploitation of victims for the sake of personal profit. For a financial crime, these factors point toward the highest degree of culpability.

4.  *The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal
    Conduct*

General deterrence is particularly important here.  Online scams taking advantage of the
lonely and elderly are rampant.  *See, e.g.*, Federal Trade Commission, "Romance scammers'
favorite lies exposed," Feb. 9, 2023, available at https://www.ftc.gov/news-events/data-
visualizations/data-spotlight/2023/02/romance-scammers-favorite-lies-exposed#ft1        (reported
losses from online romance scams reached "staggering" $1.3 billion across 70,000 victims in
2022).[5]  The scam is easy to complete, and the huge amounts of money make it all too attractive
to carry out.  Often, those "wooing" the victims are located overseas, out of the reach of the
government's jurisdiction.  But, they depend on participants in the United States, like Umeh and
his co-conspirators, to accomplish the scheme.  Umeh's sentence should reflect the need to deter
the many others who might otherwise engage in the same sort of misconduct if there is to be any
chance of driving down the billions in losses to victims annually.  *United States v. Martin*, 455
F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational,
cool and calculated then sudden crimes of passion or opportunity, these crimes are prime
candidates for general deterrence.") (internal quotation omitted).

Specific deterrence is equally important here.  Umeh's criminal history is extensive and
includes having previously served multiple prior jail sentences.  Yet, his prior 2.5-year prison

---

[5] *See also* Federal Trade Commission, "Reports of romance scams hit record highs in
2021," Feb. 10, 2022, available at https://www.ftc.gov/news-events/data-visualizations/data-
spotlight/2022/02/reports-romance-scams-hit-record-highs-2021 (reported losses reached $547
million in 2021); Federal Trade Commission, "Romance scams take record dollars in 2020," Feb.
10, 2021, available at https://www.ftc.gov/news-events/blogs/data-spotlight/2021/02/romance-
scams-take-record-dollars-2020 (reported losses reached $304 million); Federal Trade
Commission, "New FTC Data Show Consumers Reported Losing More Than $200 Million to
Romance Scams in 2019," Feb. 12, 2020, available at https://www.ftc.gov/news-events/press-
releases/2020/02/new-ftc-data-show-consumers-reported-losing-more-200-million       (reported
losses reached $201 million, up 40% from 2018).

sentences were not sufficient to deter him from crime.  Indeed, contrary to Umeh's contention in

his sentencing memo, Dkt. 36 at 12, and as described in the same source he cites, *id.* at n.18, a

defendant's prior criminal history is directly correlated to his likelihood of reoffending.  *See* U.S.

Sentencing Commission, "Recidivism Among Federal Offenders: A Comprehensive Overview,"

March  2016,  available  at  https://www.ussc.gov/research/research-reports/recidivism-among-

federal-offenders-comprehensive-overview (finding that a "federal offender's criminal history was

closely correlated with recidivism rates . . . . Each additional criminal history point was generally

associated with a greater likelihood of recidivism").  What's more, the instant offense demonstrates

that Umeh's criminal conduct is moving from violent muggings to a more sophisticated financial

crime that is harder to detect and more lucrative.  A lengthy prison sentence—in particular, one

longer than the 2.5 year sentences he previously served that did not sufficiently deter him from

crime—is warranted.

> 5. *The Need to Avoid Unwarranted Sentencing Disparities Among Defendants Guilty of Similar Conduct*

The table below summarizes the sentences that similarly situated defendants have

received in this district:

| Case Name | Approx. Loss Caused | Sentence Received | Other Factors |
|---|---|---|---|
| *United States v. Kofi Osei*, No. 21-cr-10064-IT | $4.3 million | 54 months | Recruited at least 4 others to scheme for total losses exceeding $9 million |
| *United States v. Francis Okafor*, No. 22-cr-10095-DPW | $1.1 million | 24 months | Recruited to scheme by Osei; other sentencing factors under seal |
| *United States v. Mark Okuo*, No. 21-cr-10309-LTS | $1 million | 55 months | Obstructed justice after arrest, including by telling witness to lie to law enforcement |
| *United States v. Florence Musau*, No. 21-cr-10190 | $956,000 | 44 months | Also received fraudulent pandemic unemployment assistance |

| *United States v. Mike Amiegbe*, No. 21-cr-10339-IT | $828,000 | 6 months prison and 3 months home confinement | Testified at trial in *United States v. Omoruyi* |
|---|---|---|---|
| *United States v. Nosayamen Iyalekhue*, No. 20-cr-10208-RWZ | $813,000 | 63 months | CHC III; also received fraudulent pandemic unemployment assistance |
| *United States v. Macpherson Osemwegie*, No. 21-cr-10219-DJC | $686,000 | 32 months | CHC II; also received fraudulent pandemic unemployment assistance |

The three most comparable sentences are those of Florence Musau, Nosayamen Iyalekhue, and Macpherson Osemwegie, whose sentences ranged from 32 to 63 months. While Musau, who received a sentence of 44 months, caused almost $80,000 more in loss than Umeh, she did not have the extensive criminal history Umeh has, which warrants a higher sentence. On the other hand, while Umeh caused approximately $65,000 more in loss than Iyalekhue, Iyalekhue had an even more extensive criminal history, warranting a higher sentence of 63 months. Finally, while Osemwegie falls into the same criminal history category as Umeh, his criminal history score arose from a single prior conviction on which he was on probation when he committed the "romance scam" and he caused significantly less loss—more than $192,000 less—warranting a lower sentence than the one Umeh should receive. Thus, a sentence of 57 months reflects both the loss Umeh caused and his more extensive criminal history.

Umeh's reliance on the sentence Amiegbe received is misplaced. As noted above, Amiegbe testified in the trial of two co-conspirators, Henry and Osaretin Omoruyi. Amiegbe's substantially reduced sentence reflects this circumstance. Moreover, unlike Umeh, Amiegbe had no prior criminal history. Nor would the government characterize Umeh as a "subsidiary" of Amiegbe. They both opened accounts; they both withdrew victim funds. While Amiegbe eventually brought Umeh into the scheme, it was at Umeh's insistence. Contrary to his sentencing memo, Dkt. 36 at 14, at his proffer interview, Umeh explained that Amiegbe held the debit cards

9

and identifying information because he did not trust Umeh not to withdraw all the victim money for himself, not because he was directing Umeh in the scheme. Even that statement the government doubted, as bank surveillance images show Umeh on his own accessing accounts, without Amiegbe.

In any event, beyond the sentences in this district, the government's recommendation is consistent with defendants whose primary Guideline was Section 2B1.1, with a Final Offense Level of 24 and a Criminal History Category of II. As noted in the PSR, the average length of imprisonment for these defendants was 53 months and the median length of imprisonment was 56 months. PSR ¶ 132. The government's recommendation falls in line with those averages.

**Conclusion**

For the reasons herein, the government recommends a sentence of 57 months' imprisonment, 24 months of supervised release, restitution of $878,652.29, and forfeiture as laid out in the government's forfeiture motion (Dkt. 34).

Respectfully submitted,

JOSHUA S. LEVY
Acting United States Attorney

By:    /s/ Kristen A. Kearney
        KRISTEN A. KEARNEY
Dated: September 27, 2023     Assistant U.S. Attorney

**CERTIFICATE OF SERVICE**

I, Kristen A. Kearney, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

By:    /s/ Kristen A. Kearney
        KRISTEN A. KEARNEY
        Assistant U.S. Attorney